IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES MADDEN, INDIVIDUALLY AND AS THE FATHER AND REPRESENTATIVE OF THE ESTATE OF RASHAD MADDEN AND SHABREEKA KENNEDY AS NEXT FRIEND OF MINOR CHILD, M.M., | § § § § § § | |
| Plaintiffs, | § § | Civil Action No. 3:21-CV-01168-S |
| v. | § § | |
| JASON GIBBON, DUDLEY NOSWORTHY, OTHER JOHN DOE DALLAS POLICE OFFICERS, AND THE CITY OF DALLAS, TEXAS, | § § § § § | |
| Defendants. | § § | |

---

**DEFENDANTS DUDLEY NOSWORTHY AND JASON GRIBBON'S
BRIEF IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY**

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendants Jason Gribbon[1] and Dudley Nosworthy ("the Officers") submit this brief in

support of their Motion for Summary Judgment Based on Qualified Immunity.

---

[1] Defendant Gribbon's name is misspelled in the lawsuit style.

Respectfully submitted,

CITY ATTORNEY OF THE CITY OF DALLAS

Christopher J. Caso
City Attorney

s/ J. Cheves Ligon_____
J. Cheves Ligon
Senior Assistant City Attorney
Texas State Bar No. 24070147
John.ligon@dallascityhall.com

Lindsay Wilson Gowin
Senior Assistant City Attorney
Texas State Bar No. 241114001
lindsay.gowin@dallascityhall.com

Devin Q. Alexander
Assistant City Attorney
Texas State Bar No. 24104554
devin.alexander@dallascityhall.com
7DN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201
Telephone:   214-670-3519
Facsimile:   214-670-0622
*Attorneys for Defendants City of Dallas,
Jason Gribbon, and Dudley Nosworthy*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2022, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the CM/ECF system which will send notification to case participants registered for electronic notice. I further certify that to the extent applicable I have served all case participants not registered for electronic notice by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ J. Cheves Ligon_____
Senior Assistant City Attorney

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................1

II.    **STATEMENT OF UNDISPUTED FACTS** ....................................................1

III.    **APPLICABLE LEGAL STANDARDS** ........................................................4

    A.    Legal Standard for Motions for Summary Judgment ...............................4

    B.    The qualified immunity defense alters the burden of proof on summary judgment. ...................................................................................................6

IV.    **ARGUMENTS AND AUTHORITIES** .........................................................8

    A.    Officer Gribbon is entitled to qualified immunity on Plaintiffs' § 1983 excessive force claims ...........................................................................10

        1.    There was no injury. ...................................................................10

        2.    Officer Gribbon's use of force was not clearly excessive to the need. ...........................................................................................11

    B.    Sgt. Nosworthy is entitled to qualified immunity on Plaintiffs' § 1983 excessive force claims ...........................................................................15

        1.    Sgt. Nosworthy's single tasing of Mr. Madden did not violate his constitutional rights. ...........................................................16

        2.    Plaintiffs cannot establish that the Officers violated a constitutional right that was clearly established at the time of the incident. ...................................................................................18

V.    **CONCLUSION** ............................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ........................................................................................... 7, 8

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ............................................................................................... 5

*Babb v. Dorman*,
   33 F.3d 472 (5th Cir. 1994) .................................................................................... 8

*Batyukova v. Doege*, 994 F.3d 717 (5th Cir. 2021) ................................................... 10

*Brown v. Callahan*,
   623 F.3d 249 (5th Cir. 2010) .................................................................................. 6

*Buchanan v. Gulfport Police Dep't*, 530 Fed.Appx. 307 (5th Cir. 2013) ..................... 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...................................................................................... 4, 5, 6

*Cloud v. Stone*, 993 F.3d 379 (5th Cir. 2021) ........................................................... 17

*Davis v. McKinney*,
   518 F.3d 304 (5th Cir. 2008) .................................................................................. 7

*Duckett v. City of Cedar Park*,
   950 F.2d 272 (5th Cir. 1992) .................................................................................. 5

*Eason v. Thaler*,
   73 F.3d 1322 (5th Cir. 1996) .................................................................................. 6

*Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012) ..................................................... 14

*Evans v. Ball*,
   168 F.3d 856 (5th Cir. 1999) .................................................................................. 8

*Forsyth v. Barr*,
   19 F.3d 1527 (5th Cir. 1994) ............................................................................... 5, 6

*Foster v. City of Lake Jackson*,
   28 F.3d 425 (5th Cir. 1994). .................................................................................. 7

*Garza v. Briones*, 943 F.3d 740 (5th Cir. 2019) ...................................................... 14

*Gassner v. City of Garland*,
    864 F.2d 394 (5th Cir. 1989) ................................................... 6

*Gibson v. Rich*,
    44 F.3d 274 (5th Cir. 1995) ..................................................... 8

*Griggs v. Brewer*,
    841 F.3d 308 (5th Cir. 2016) ................................................... 7

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)........................................................... 6, 7

*Harris v. Serpas*, 745 F.3d 767 (5th Cir. 2014) ........................... 9

*Hutcheson v. Dallas County*, 994 F.3d 477 (5th Cir. 2021) .................. 9, 10

*Lynch Props. v. Potomac Ins. Co.*,
    140 F.3d 622 (5th Cir. 1998) ................................................... 6

*Malley v. Briggs*,
    475 U.S. 335 (1986)............................................................. 8

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574 (1986)............................................................. 6

*McClendon v. City of Columbia*,
    305 F.3d 314 (5th Cir. 2002) ................................................... 6

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011) ................................................. 18

*Mullenix v. Luna*,
    136 S. Ct. 305 (2015)...................................................... 17, 18

*Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379 (5th Cir. 2009) ........... 14

*Pearson v. Callahan*,
    555 U.S. 223 (2009)........................................................... 7, 8

*Pierce v. Smith*,
    117 F.3d 866 (5th Cir. 1997) ................................................... 7

*Ramirez v. Guadarrama*, 3 F.4th 129 (5th Cir. 2021) ........................ 13

*Ratliff v. Aransas County*, 948 F.3d 281 (5th Cir. 2020)....................... 9

*Reichle v. Howards*,
    566 U.S. 658 (2012)........................................................... 18

*Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122 (5th Cir. 2014)......................................................9

*Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011) ....................................................9

*Roque v. Harvel*, 993 F.3d 325 (5th Cir. 2021) ....................................................9, 13

*Ryburn v. Huff*, 565 U.S. 469 (2012) ....................................................10

*Saucier v. Katz*,
    533 U.S. 194 (2001)....................................................8

*Tennessee v. Garner*, 471 U.S. 1 (1985)....................................................10

*Topalian v. Ehrman*,
    954 F.2d 1125 (5th Cir. 1992) ....................................................5

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

The Officers submit the following Brief in Support of their Motion for Summary Judgment Based on Qualified Immunity (Dkt. No. 38.) The Officers incorporate by reference Defendants' Appendix in Support of Motion for Summary Judgment Based on Qualified Immunity ("App.", Dkt. No. 39-1), which is filed separately in compliance with Local Rule 56.6(b).

## I.     INTRODUCTION

Rashad Madden's death is a tragedy.  The City of Dallas, Defendant Jason Gribbon, Defendant Dudley Nosworthy, and their counsel express their sincere condolences to the family and friends who suffered his loss.

On the date of Defendants' interaction with Rashad Madden, numerous witnesses—including civilians—plainly observed him armed with a handgun, display suicidality, make threats against the lives of officers, and refuse multiple orders to drop his weapon prior to and until any deployment of force.  Defendant Jason Gribbon and Defendant Dudley Nosworthy acted in a judicious manner when confronted with the tense, dangerous situation presented to them.  Acting in defense of fellow officers, themselves, and members of the public, both Defendants deployed reasonable levels of force to stop what they reasonably perceived to be a threat.

Therefore, Plaintiffs cannot maintain a civil lawsuit against Defendant Jason Gribbon and Defendant Dudley Nosworthy and this suit must be dismissed with prejudice.

## II.     STATEMENT OF UNDISPUTED FACTS

On May 28, 2019, Rashad Madden ("Mr. Madden") appeared on the lot of a truck dealership in Dallas owned by Mr. Mitchell Wallace.  (DPD Incident Report, App. at 23.)   Mr. Madden presented with a drawn handgun.  *Id.*  When Mr. Wallace expressed that he did not believe Mr. Madden's handgun was real, Mr. Madden racked the gun, ejecting a round.  *Id.*  Mr. Wallace then drew his own handgun, after which Mr. Madden pointed his handgun at his own neck and

crawled underneath a van.  *Id.*  Mr. Wallace called 911 and relayed the above to the operator.[2] (Wallace 911 call, App. at 247.)

The 911 dispatcher sent out a 46A call (Crisis Intervention Team – with ambulance) for officers to respond.  (Sgt. Nosworthy SIU Aff. and Dec., App. at 74; 244-246.)  According to the dispatcher, a black male at the truck dealership had a gun to his head and was threatening suicide; both Officers heard this information from the call.  (Sgt. Nosworthy SIU Aff. and Dec., App. at 74; 244-246; Gribbon Dec. at App. 2-4.)   Numerous Dallas Police Department ("DPD") officers responded to the scene, including the Officers.  *Id.*

Upon arrival, numerous officers witnessed Mr. Madden in possession of a handgun while under the van.  (Gribbon SIU Aff. and Dec. App. at 68, 2-4; Sgt. Nosworthy SIU Aff. and Dec., App. at 74; 244-246; Nelson SIU Aff., App. at 76; Foster SIU, App. at 77; Ramirez SIU Aff., App. at 80).  Mr. Madden was suicidal, and he also threatened to kill DPD officers while under the van. Several officers, including Officer Foster and Officer Filmore, specifically heard Mr. Madden say he was going to kill the police officers if they did not kill him.  (Foster SIU Aff., App. at 77; Filmore SIU Aff., App. at 81.)  DPD officers repeatedly ordered Mr. Madden to drop his handgun, but Mr. Madden refused.  (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4; Gribbon BWC[3], App. 1; Foster SIU Aff., App. at 77; Mulrenan SIU Aff., App. at 79.)

When Sgt. Nosworthy arrived on scene, he encountered the property owner, Mr. Wallace. (Nosworthy Dec., App. at 244-46.)  Mr. Wallace informed Sgt. Nosworthy that Mr. Madden had pointed a handgun at him, then pointed the handgun at himself, before retreating to underneath the van.  *Id.*  Sgt. Nosworthy then assumed a prone position near the van with his firearm drawn.  *Id.*

---

[2] Even after Mr. Madden had entered onto his dealership with a drawn weapon, Mr. Mitchell repeatedly begged Mr. Madden to not commit suicide. (Wallace 911 Call, App. at 247)

[3] *See* minute 5:20 onward.

Assessing he could better resolve the situation by utilizing his Taser, Sgt. Nosworthy holstered his handgun and drew his Taser. *Id*. After moving to the rear of the van, Sgt. Nosworthy witnessed Mr. Madden holding the handgun, rolling side to side, pointing the handgun at both sides of the van. *Id*. During this time, officers were constantly commanding Mr. Madden to drop the handgun, but Mr. Madden did not comply. *Id*. After Mr. Madden rolled into a position exposing his torso, Sgt. Nosworthy fired his Taser at Mr. Madden. *Id*. Sgt. Nosworthy did not fire his Taser again. *Id*. The Officers, as well as other witnesses, observed that the tasing appeared to have no impact on Mr. Madden. (Nosworthy SIU Aff., App. at 74; Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4; Nelson SIU Aff., App. at 76.)

Numerous DPD officers saw Mr. Madden point his handgun at officers. (Arias SIU Aff., App. at 80; Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4.) Seeing Mr. Madden begin to turn his handgun on officers, Officer Gribbon commanded Mr. Madden to drop the gun. (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4; Gribbon BWC[4], App. at 1.) Mr. Madden then pointed his handgun directly at Officer Gribbon. (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4). Officer Gribbon, fearing he was about the be murdered, fired his sidearm at Mr. Madden one time, but missed. (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4; Gribbon BWC, App. at 1; Autopsy Report App. at 156-162; Mulrenan SIU Aff., App. at 79.)

After Officer Gribbon fired his weapon, DPD officers were able to pull Mr. Madden from below the van and place him into custody. (Nelson SIU Aff., App at. 76; Nosworthy SIU Aff., App. at 74; Gribbon SIU Aff., App. at 68.) After he was apprehended, officers secured Mr. Madden's handgun. (Nosworthy SIU Aff., App. at 74; Nelson SIU Aff., App. at 76.) DPD personnel searched Mr. Madden's person for a gunshot wound and were unable to find one.

---

[4] *See* minute 4:30 onward.

(Mulrenan SIU Aff., App. at 79.)  Critically, while Mr. Madden's medical records contain evidence of taser strikes and handcuffs, Plaintiff's medical records do not list any evidence of a gunshot wound.  (Autopsy Report, App. at 156-162.)   After arriving at the hospital, Mr. Madden suffered a seizure, was required to be intubated, and tragically deteriorated over a two-month period.  *Id*. On July 28, 2019, two months after the incident at Mr. Wallace's truck dealership, Mr. Madden died.  *Id.*  The medical examiner determined Mr. Madden died due to the toxic effects of cocaine and amphetamines.  *Id*.  The medical examiner never determined that a bullet struck Mr. Madden, or that tasing caused or contributed to his death.  *Id.*  No evidence exists that any DPD personnel's actions, tasings, or shooting caused or contributed to Mr. Madden's death.

After the aforementioned incident at the truck dealership, DPD Internal Affairs Department and Public Integrity Unit respectively found that Officer Gribbon had not violated any DPD policy or criminal laws. (IAD Investigation, App. at 232-243)  He was also "No-Billed" by a Dallas County Grand Jury for the shooting.  (SIU Investigation, App. at 227.)  DPD Internal Affairs likewise found no evidence that Sgt. Nosworthy violated any DPD policies or contributed to Mr. Madden's death.   (IAD Investigation, App. at 232-243)

Mr. Madden was charged with Aggravated Assault with a Deadly Weapon for pointing his handgun at Mr. Wallace.  (IAD Investigation, App. at 232-243)

### III.   APPLICABLE LEGAL STANDARDS

#### A.   Legal Standard for Motions for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a

verdict in favor of the nonmoving party. *Id* at 323.

A party seeking summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The moving party, however, need not support his motion with affidavits or other evidence negating the elements of the nonmovant's claim. *Id.* Once the moving party has satisfied this initial burden, the burden then shifts to the nonmoving party to show that summary judgment is not proper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992).

To withstand a motion for summary judgment, the nonmovant must present evidence sufficient to establish the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-23; *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In other words, the nonmovant must set forth specific facts supported by competent summary judgment evidence that would establish each of the challenged elements of its case for which it will bear the burden of proof at trial. *Topalian*, 954 F.2d at 1131. The nonmovant cannot rest upon mere conclusory allegations or denials of the adverse party's pleadings but must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" should not be considered by the Court. *Id.*

While the Court must construe all evidence and justifiable inferences drawn from the record in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio*,

475 U.S. 574, 587 (1986), it need not consider conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation when ruling on a summary judgment motion. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth*, 19 F.3d at 1533. Moreover, the Court should not assume in the absence of sufficient proof that the nonmovant could or would prove the necessary facts. *Lynch Props. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

**B.    The qualified immunity defense alters the burden of proof on summary judgment.**

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, provided their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Police officers are specifically entitled to assert this qualified immunity defense. *Gassner v. City of Garland*, 864 F.2d 394 (5th Cir. 1989).  The Officers have affirmatively pled the defense of qualified immunity with respect to Plaintiffs' § 1983 claims.

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id*.  Plaintiffs bear the burden of proof both on summary judgment and at trial. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

In determining qualified immunity, courts engage in a two-part analysis that can be performed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). One part of the analysis entails "assess[ing] whether a statutory or constitutional right [were] violated on the facts alleged." *Id*. The plaintiff must show "that the official violated [his or her] statutory or constitutional right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

Second, the plaintiff must show that "the right was 'clearly established' at the time of the challenged conduct." *al-Kidd,* 131 S. Ct. at 2080 (quoting *Harlow*, 457 U.S. at 818). A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right at issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense, but in a more particularized sense so that it is apparent to the official that his actions (what he is doing) are unlawful in light of pre-existing law. *Creighton*, 483 U.S. at 640; *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997) (holding that to overcome qualified immunity, pre-existing law must truly compel the conclusion that what the defendant is doing violates federal law in the circumstances).

The analysis does not end there. Even if the government official's conduct violates a clearly established right, the official is entitled to immunity if his conduct was objectively reasonable. *See Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008). Taken together, the second step in the analysis requires the Court to determine "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." *Charles*, 522 F.3d at 511. In *Creighton*, the Supreme Court refined the qualified immunity standard and

held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him.  483 U.S. at 641.  If public officials or officers of "reasonable competence could disagree [on whether an action is legal], immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)).  Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law."  *Malley*, 475 U.S. at 341.

The Supreme Court also has clarified that the two-prong protocol established in *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part by Pearson*, 555 U.S. 223, while often still appropriate, is no longer mandatory when resolving qualified immunity claims.  District courts may exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.  *Pearson*, 555 U.S. at 336.

## IV.    ARGUMENTS AND AUTHORITIES

To defeat the Officers' qualified immunity defense, Plaintiffs must also prove that their conduct was objectively unreasonable under the circumstances.  *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999).  Plaintiffs have the burden of proving each element of the qualified immunity analysis, but they cannot prove any of them.  Because Plaintiffs cannot satisfy either prong of the qualified immunity analysis, the Officers are entitled to qualified immunity and summary judgment on Plaintiffs' § 1983 claim.

Plaintiffs' sole claim against the Officers sounds in the Fourth Amendment's prohibitions against excessive force.  Compl. ¶¶ 33-40.  As the Fifth Circuit has held:

> The Fourth Amendment turns   on   reasonableness.   And   '[t]he   calculus   of
> reasonableness must embody allowance for the fact that police officers are often
> forced to make split-second judgments—in circumstances that are tense, uncertain,

> and rapidly evolving—about the amount of force that is necessary in a particular situation.' This allowance is particularly understandable when police officers encounter suicidal suspects.

*Roque v. Harvel*, 993 F.3d 325, 329 (5th Cir. 2021) (citation omitted.)  The Fifth Circuit routinely finds no constitutional violations when even deadly force is used against armed, noncompliant suicidal suspects.  *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1134 (5th Cir. 2014) (finding no constitutional violation where officer shot allegedly suicidal individual, who had been ordered multiple times to drop the gun he was carrying, while he was walking to his kitchen*); Harris v. Serpas*, 745 F.3d 767, 770, 772–73 (5th Cir. 2014) (finding no constitutional violation where officers, responding to an ex-wife's 911 call stating that she feared her ex-husband may have taken an overdose of sleeping pills, breached the barricaded door to the ex-husband's bedroom and shot him when he raised a knife over his head and advanced toward them); *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (finding no constitutional violation where officers breached allegedly suicidal individual's bedroom door and shot him after he attacked them with knives.)

"To establish excessive force under the Fourth Amendment, a plaintiff must demonstrate (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Hutcheson v. Dallas County*, 994 F.3d 477, 480 (5th Cir. 2021) (quotation omitted).  After an injury is established, the court must consider the second two elements—asking whether the officer's "resort to deadly force was unreasonable and excessive when the facts are viewed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Ratliff v. Aransas County*, 948 F.3d 281, 287–88 (5th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The "excessive" and "unreasonable" inquiries require the court to exercise "cautio[n] about second-guessing a police officer's assessment, made on the

scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

The "reasonableness" inquiry requires the court to consider "the crime's severity, the suspect's threat, and whether the suspect is actively resisting arrest or trying to flee." *Hutcheson*, 994 F.3d at 480. Courts also assess the reasonableness of using deadly force by considering whether a "suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "Stated differently, '[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm.' " *Batyukova v. Doege*, 994 F.3d 717, 725 (5th Cir. 2021) (alteration in original) (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)). While conducting this analysis, courts remain mindful that "Fourth Amendment reasonableness is predominantly an *objective* inquiry." *al-Kidd*, 563 U.S. at 736 (emphasis added) (quotation omitted). If "the circumstances, viewed objectively, justify the challenged action," then subjective intent doesn't matter. *Id.* (quotation omitted). "This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts; and it promotes evenhanded, uniform enforcement of the law." *Id.* (citation omitted).

### A.   Officer Gribbon is entitled to qualified immunity on Plaintiffs' § 1983 excessive force claims

Applied here, no reasonable analysis can find Officer Gribbon's actions on the day Mr. Madden was apprehended to have been excessive, much less unreasonably so. Simply, even if the single firing of Officer Gribbon's handgun that missed is considered an "injury," Officer Gribbon reasonably believed Mr. Madden posed a threat of serious harm to others.

### 1.  There was no injury.

Officer Gribbon did not inflict any injury, or even accomplish a seizure, on Mr. Madden. Plaintiffs' claims against Officer Gribbon fail on this alone.  As well documented, Officer Gribbon's single discharge of his firearm made no contact with Mr. Madden.  At the scene, DPD personnel searched Mr. Madden's person for a gunshot wound and were unable to find one. (Mulrenan SIU Aff., App. at 79.)  Critically, while Mr. Madden's medical records contain evidence of taser strikes and handcuffs, Plaintiff's medical records do not list any evidence of a gunshot wound.  (Autopsy Report, App. at 156-162)   After arriving at the hospital, Mr. Madden suffered a seizure, was required to be intubated, and tragically deteriorated over a two-month period before his death.  *Id.*  Ultimately, the medical examiner determined Mr. Madden's death was the result of "the toxic effects of cocaine and amphetamines."  *Id.*

Officer Gribbon's single missed shot did not constitute a Fourth Amendment seizure of Mr. Madden.  Research reveals no case law where a "shoot and miss" constitutes a seizure or the cause of a legally cognizable injury.  Here, there is no evidence Officer Gribbon's single bullet made any corporal contact with Mr. Madden either directly or indirectly.

Therefore, because Plaintiffs cannot even establish that Officer Gribbon applied any force on, or contact to, Mr. Madden, Plaintiffs' excessive force claims against Officer Gribbon must be dismissed for failure to show any injury.

### 2.  Officer Gribbon's use of force was not clearly excessive to the need.

Even had Officer Gribbon's use of deadly force made contact with Mr. Madden, the evidence unequivocally shows his use of force was not excessive.

There is no factual dispute that police dispatch alerted the DPD officers rushing to the scene that Mr. Madden was in possession of a gun and had it pointed at himself.  In fact, Officer Gribbon

11

heard that specific information on his way to the scene.  (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4.)

There is no factual dispute that Mr. Madden was in possession of a handgun while under the van.  (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4; Nosworthy SIU Aff. and Dec., App. at 74; 244-46; Nelson SIU Aff.,  App. at 76; Foster SIU Aff., App. at 77; Ramirez SIU Aff. at App. at 80.)

There is no factual dispute that Mr. Madden was plainly exhibiting suicidality.  (Gribbon SIU Aff., App. at 68 and Gribbon Dec. at App. 2-4; Nosworthy SIU Aff. and Dec., App. at 74 and 244-46.)    Several officers, including Officer Foster and Officer Filmore, heard Mr. Madden say he was going to kill the police officers if they did not kill him.  (Nelson SIU Aff., App. at 76; Foster SIU Aff., App. at 77.)

There is no factual dispute that prior to Officer Gribbon discharging his firearm, DPD officers had repeatedly ordered Mr. Madden to drop his handgun but Mr. Madden repeatedly refused.  (Gribbon SIU Aff., App. at 68; Gribbon Dec. at App. 2-4; Gribbon BWC, App. at 1; Foster SIU  Aff., App. at 77; Mulrenan SIU Aff., App. at 79.)

There is no factual dispute that prior to Officer Gribbon discharging his firearm, DPD officers had tased Mr. Madden to make him comply with their orders to drop his weapon.  (Gribbon SIU Aff. App. at 68 and Gribbon Dec. at App. 2-4; Nosworthy SIU Aff. and Dec., App. at 74 and 244-46; Rayas SIU Aff., App. at 78.)

There is no factual dispute that prior to Officer Gribbon discharging his firearm, DPD officers saw Mr. Madden point his handgun at officers.  (Arias SIU Aff, App. at 80; Gribbon SIU Affidavit App. at 68; Gribbon Dec. at App. 2-4.)

There is no factual dispute that prior to Officer Gribbon discharging his firearm, he commanded Mr. Madden to drop his gun.  (Gribbon SIU Aff., App. at 68 and Gribbon Dec. at App. 2-4; Gribbon BWC starting at 5:20, App. 1.)

There is no factual dispute that prior to Officer Gribbon discharging his firearm, Mr. Madden pointed his handgun directly at Officer Gribbon.  (Gribbon SIU Aff., App. at 68 and Gribbon Dec. at App. 2-4.)

Officers cannot be held to 20/20 hindsight in any dangerous situation, but especially so in the case of a suicidal suspect.  *Roque*, 993 F.3d at 329.  In a recent case, the Fifth Circuit granted officers qualified immunity for the tasing of a suicidal man who was covered in gasoline and appeared to be holding a lighter inside a populated home.  *Ramirez v. Guadarrama*, 3 F.4th 129, 134–35 (5th Cir. 2021).  Applying the *Graham* factors,[5] the court first found the severity of the "threatened crime" (felony arson) to be "considerable."  Second, the man was threatening suicide while covered in gasoline, and was thus "posed a substantial and immediate risk of death or serious bodily injury to himself and everyone in the house."  *Id*.  Lastly, the court did not find it necessary to consider the final *Graham* factor of whether the suspect was attempting to flee or resisting arrest.  *Id*. at 135.

Here, as in *Ramirez*, Mr. Madden's behavior more than meets the *Graham* factors.  First, his threatened crime—killing the police officers at the scene—is of the highest severity. Madden explicitly threatened to kill the officers, was armed and able to do so, and refused to surrender his firearm. As noted above, multiple officers heard Mr. Madden's threats to kill officers.  Officer

---

[5] " . . . the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*., at 134 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989).)

Foster even heard Mr. Madden chamber his gun during these threats.  (Foster SIU Aff., App. at 77)  Second, Mr. Madden was in possession of a firearm, displayed suicidality, refused multiple orders to drop his gun, and threatened to kill the police officers.  The combination of the aforementioned clearly meets the second *Graham* factor.  As to the final *Graham* factor, Mr. Madden was refusing orders to relinquish his weapon and thus resisting arrest.

The Fifth Circuit has found use of deadly force reasonable in situations with far less evidence of a threat of serious harm to others and the officer than what Officer Gribbon faced. *See, e.g.*, *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) (holding that an officer did not use excessive force when the individual "ignored repeated instructions to put down the knife, . . . [was] in close proximity to [the officer], and [was] moving closer"); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 385 (5th Cir. 2009) (finding deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon.)

In fact, in a 2019 case, the Fifth Circuit found officers firing at a suspect in very similar circumstances was not excessive and the shooting officers were entitled to summary judgment.  In *Garza v. Briones*, officers responded to a call alerting  them that an individual was playing with a pistol outside a truck stop's bar.  943 F.3d 740, 743 (5th Cir. 2019).  An officer ordered the suspect to put the firearm down, but he refused.  *Id*.  The suspect continued to move the handgun around while "making facial gestures" at the officer.  *Id*.  Other officers arrived and witnessed the suspect being told to put his weapon down, but the suspect continued to refuse.  *Id*.  Finally, the suspect pointed his weapon "in [the officer's] direction."  *Id*. at 744.  When the suspect again refused to drop the weapon, the officer opened fire, as did other officers.  *Id*.  The weapon turned out to be a BB gun.  *Id*.  The Fifth Circuit noted that just prior to the shooting, the suspect had behaved

14

erratically, refused to comply with orders, and was displaying what reasonably appeared to be a handgun. *Id*. at 745. Immediately prior to the shooting, the suspect pointed his weapon at the officer and lowered his eyes down the eyeline. *Id*. The Fifth Circuit not only found the shooting itself was not excessive force, but also that "[a] reasonable officer in any of the defendants' shoes would have believed that [the suspect] posed a serious threat regardless of the direction that [the suspect] was pointing his gun just before he was shot." *Id*. at 747. In this case, Officer Gribbon similarly faced an erratic suspect with a handgun who refused multiple orders to put his weapon down. Officer Gribbon also similarly faced that same sort of suspect pointing the weapon directly at him. No evidence shows Mr. Madden in the process of surrendering or relinquishing his weapon, thereby ending the threat. Therefore, like the officer in *Garza*, Officer Gribbon's use of force was not excessive.

Officer Gribbon was required to make split-second decisions in a tense situation. Viewing the incident from the requisite perspective of a reasonable officer on the scene, Plaintiffs cannot create the requisite genuine dispute for whether the missed shot Mr. Madden in order to subdue him was either excessive to the need or objectively unreasonable. *See Graham*, 490 U.S. at 396. Therefore, Plaintiffs' claims against Officer Gribbon must be dismissed.

**B.    Sgt. Nosworthy is entitled to qualified immunity on Plaintiffs' § 1983 excessive force claims.**

Applied here, no reasonable analysis can find Sgt. Nosworthy's actions on the day Mr. Madden was apprehended to have been excessive, much less unreasonably so. Given the undisputed circumstances, Sgt. Nosworthy's actions were not only entirely lawful, but exhibited personal bravery and professional restraint.

### 1. Sgt. Nosworthy's single tasing of Mr. Madden did not violate his constitutional rights.

In brief summary of the above discussion of the facts, when Sgt. Nosworthy arrived on scene, he learned that a suicidal man armed with a handgun was under one of the vans on the property.  (Nosworthy Dec., App. 244-46.)  He saw an erratic Mr. Madden manipulating the handgun under the van and refusing direct police orders to drop the weapon.  *Id.*  Rather than use his firearm to stop the threat—which would have been constitutionally justified—Sgt. Nosworthy holstered his firearm and instead deployed his taser.  *Id.*  Sgt. Nosworthy deployed the taser while Mr. Madden remained armed, uncompliant to police orders to drop his weapon, and well within range of harming the other DPD officers on scene.[6]  *Id.*

Deploying a taser in this situation did not amount to excessive force.  As the Fifth Circuit recently explained:

> Our cases on police use of tasers have paid particular attention to whether officers faced active resistance when they resorted to a taser. Where, as here, the severity of crime and immediate safety threat are relatively inconclusive, a suspect's active resistance to arrest may justify this degree of force. For example, we have held that two officers were reasonable to tase an arrestee because he had "aggressively evaded [their] attempts to apprehend him," and because they did so after the arrestee "continuously failed to comply," other "efforts to subdue [him] were ineffective," and the arrestee had "continued to resist handcuffing" and "kicked an officer after being taken to the ground." *Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016). In that case, we took as further evidence of "measured and ascending" action that "neither officer used [his] taser as the *first method* to gain [the arrestee's] compliance." *Ibid.*;  In another case—one not involving a taser but nonetheless relevant—we held that an officer reasonably pushed an arrestee onto the hood of a police cruiser, causing some bruises and chest pain, because the arrestee "resisted when [the officer] attempted to place handcuffs on him." *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009). Specifically, the arrestee had "pulled his hand back and turned away from the officer," then grappled with him briefly. *Id.* at 216.

By contrast, we have found excessive force when officers tased someone offering

---

[6] The body-worn camera recorded exactly how close in proximity the DPD personnel were to Mr. Madden; had Mr. Madden made good on his threats to harm the police, numerous officers' lives were plainly in peril.  (Gribbon BWC starting at 4:30, App. at 1.)

only passive resistance or no resistance at all. For example, we held that officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an "off-color joke." *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012).  Under those circumstances, police could not "immediately resort[ ] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id.* at 763. In another case, we found excessive force when an officer tased someone who did no more than pull his arm out of the officer's grasp, and who was not even suspected of a crime up to that point. *Ramirez v. Martinez*, 716 F.3d 369, 372, 378 (5th Cir. 2013); *see also Trammell v. Fruge*, 868 F.3d 332, 341–42 (5th Cir. 2017) (arrestee pulling his arm away from officer's grasp did not alone justify two officers' tackling him to the ground).  Likewise, we recently found excessive force when officers repeatedly beat and tased a man who "was not suspected of committing any crime, was in the fetal position, and was not actively resisting." *Joseph*, 981 F.3d at 336; *see also id.* at 335 ("If Joseph was not actively resisting, [officers] inflicted force beyond what the Fourth Amendment permits.").[6]

*Cloud v. Stone*, 993 F.3d 379, 384–85 (5th Cir. 2021)(citations omitted); *see also Buchanan v. Gulfport Police Dep't*, 530 Fed.Appx. 307, 314 (5th Cir. 2013) (per curiam) ("[W]here a suspect resists arrest *or fails to follow police orders*, officers do not violate his right against excessive force by deploying their tasers to subdue him." (emphasis added)).

With that backdrop, Sgt. Nosworthy's use of his taser was not a violation a Mr. Madden's constitutional rights to be free from excessive force.  At the moment the taser was deployed, Mr. Madden was armed, refusing orders to drop his weapon, not in custody, had made verbal threats against the lives of DPD officers, and was suicidal.   Knowing all this, and reasonably fearing for his life and those of his fellow officers, Sgt. Nosworthy nonetheless made the real-time decision to use less-than-lethal force to stop the threat.   Sgt. Nosworthy was required to make split-second decisions in a tense situation.  Viewing the incident from the requisite perspective of a reasonable officer on the scene, Plaintiffs cannot create the requisite genuine dispute for whether tasing Mr. Madden in order to subdue him was either excessive to the need or objectively unreasonable.  *See Graham*, 490 U.S. at 396.  Therefore, Plaintiffs' claims against Sgt. Nosworthy must be dismissed.

### 2. Plaintiffs cannot establish that the Officers violated a constitutional right that was clearly established at the time of the incident.

Even if the Court were to find that Plaintiffs have shown that the Officers violated Mr. Madden's constitutional right, which they cannot, Plaintiffs cannot show such a constitutional right was clearly established at the time of the incident. The "clearly established" prong of the qualified immunity analysis requires a demonstration that the right allegedly violated is one that "'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  This does not mean that a plaintiff must present "'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 308 (quoting *al-Kidd*, 131 S. Ct. at 2083).  A plaintiff may show that the existence of the right that was allegedly violated was "beyond debate" by "point[ing] to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (quoting *al-Kidd*, 131 S. Ct. at 2083).  As this court has found, Fifth Circuit "precedents [have] built qualified immunity into a nearly insurmountable obstacle." *Crane v. City of Arlington, Tex.*, 542 F. Supp. 3d 510, 513–14 (N.D. Tex. 2021) (citing *Ramirez v. Guadarrama*, 844 F. App'x 710 (5th Cir. 2021) (holding qualified immunity barred suit when officers found suspect doused in gasoline, knew their tasers would ignite him, and quickly tased him, "causing him to burst into flames")).

As shown above, Fifth Circuit case law holds that the Officer Defendants' actions were not excessive.  No case law in this circuit put the Officers on notice that firing a weapon or taser at Mr. Madden in the undisputed circumstances was "clearly established" as unconstitutional.

## V.    CONCLUSION

The Officers have shown that Plaintiffs have failed to adduce sufficient evidence to establish any of their claims. Accordingly, the Officers are entitled to qualified immunity on Plaintiffs' § 1983 claims, and should be granted summary judgment as a matter of law on all of Plaintiffs' claims against them.