# United States District Court
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

JAMES MADDEN, *Individually and as* §
*Father and Representative of the Estate of* §
*Rashad Madden*, and SHABREEKA §
KENNEDY, *as Next Friend of Minor* §
*Child, M.M.* §
§
v. § CIVIL ACTION NO. 3:21-CV-1168-S
§
JASON GRIBBON, DUDLEY §
NOSWORTHY, OTHER JOHN DOE §
DALLAS POLICE OFFICERS, and THE §
CITY OF DALLAS, TEXAS §

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses Defendants Jason Gribbon and Dudley

Nosworthy's Motion for Summary Judgment Based on Qualified Immunity ("Motion") [ECF No.

38]. The Court has reviewed the Motion, Defendants Dudley Nosworthy and Jason Gribbon's Brief

in Support of Their Motion for Summary Judgment Based on Qualified Immunity [ECF No. 39],

Plaintiffs' Response and Brief in Support to Defendants Dudley Nosworthy and Jason Gribbon's

Brief in Support of Their Motion for Summary Judgment Based on Qualified Immunity [ECF No.

43] ("Response Brief"), Defendants Jason Gribbon and Dudley Nosworthy'[s] Reply Brief in

Support of Their Motion for Summary Judgment [ECF No. 45], the summary judgment evidence

presented,[1] and the applicable law. For the following reasons, the Court **GRANTS** the Motion.

---

[1] Defendants filed their Appendix in Support of Motion for Summary Judgment Based on Qualified Immunity
("Appendix") [ECF No. 39-1], and both parties manually submitted USB flash drives, *see* ECF Nos. 41, 44. The
evidence contained therein includes the following: footage obtained from Defendant Jason Gribbon's body-worn
camera, *see* App. 1; declarations from Defendants Jason Gribbon and Dudley Nosworthy, *see* App. 2-4, 244-46; a
Special Investigation Unit file containing affidavits from witnesses, investigation materials, and an autopsy report, *see*
App. 15-231; documents from the Dallas Police Department's Internal Affairs Division Investigation, *see* App. 232-
43; and audio from witness Mitchell Wallace's 9-1-1 call related to the incident, *see* App. 247.

## I.    BACKGROUND

Plaintiffs James Madden, individually and as the father and representative of Rashad Madden's estate, and Shabreeka Kennedy, as next friend of minor child, M.M. (collectively "Plaintiffs"), filed this civil action pursuant to 42 U.S.C. § 1983 alleging Defendants officers Jason Gribbon ("Gribbon") and Dudley Nosworthy, II ("Nosworthy") (collectively "Defendants") used excessive force in connection with the arrest of the late Rashad Madden ("Madden").

On May 28, 2019, at approximately 7:50 p.m., Dallas Police Department ("DPD") received a 9-1-1 phone call from Mitchell Wallace ("Wallace"), the owner of a truck dealership. *See* App. 247 ("9-1-1 Call"). Wallace told police that Madden approached him on his dealership lot with a drawn handgun and pointed the weapon at him. *Id.* at 04:27-04:50; Witness Sheet, App. 58. Wallace, "fearing for his safety," pulled out his own handgun in defense. *Id*. Madden stopped walking, pointed his handgun at his own neck, and threatened to pull the trigger. 9-1-1 Call at 04:27-04:50; Witness Sheet, App. 58. Madden began to verbally threaten suicide and "shout[] about his daughter." 9-1-1 Call at 00:05-00:16.

While on the phone with DPD, Wallace urged Madden not to take his life. *Id.* at 01:04-02:37 (telling Madden "not to do that," "at least talk about it first," and "it's going to be okay"). Wallace attempted to comfort Madden and told him that the police are coming to help him and "get his daughter." *Id.* Madden continued to threaten suicide. *See id.* After a few minutes, Madden "racked" the gun, pulling the "slide" or part of the gun that recoils back towards himself, and ejected a live bullet. *Id.* at 02:36-02:40. He picked the bullet up and put it back in his gun. *Id.* Wallace continued to tell Madden to stop, offering to help him. *Id.* at 2:40-3:46. Holding the handgun and threatening suicide, Madden then crawled under one of the vans on the dealership lot. *Id.* at 03:46.

2

Approximately five minutes into Wallace's phone call with police, officers Thomas Foster ("Foster") and Dylan Nelson arrived on the scene. *Id.* at 04:58. Foster claims that upon arrival, he observed Madden under the van, holding a handgun and foaming at the mouth. Foster Aff., App. 77; Investigation Documents ("Inv. Docs."), App. 28, 235. Nosworthy and six other officers arrived shortly after. Inv. Docs., App. 28. Wallace begged the officers not to shoot Madden. 9-1-1 Call at 05:20-05:34 (exclaiming "please don't shoot him"); Nosworthy Decl., App. 244. According to Nosworthy, Nosworthy unholstered his firearm and told Wallace to move to the other side of the lot. Nosworthy Decl., App. 244. Nosworthy then holstered his gun and drew his taser, believing he "could better resolve the incident" that way. *Id.* at 244-45. Foster also had his taser drawn, while the other officers held guns. Inv. Docs., App. 28.

In his affidavit, Foster asserts that he crouched near the front driver's side wheel of the van under which Madden hid and instructed Madden to drop the handgun. Foster Aff., App. 77. Around the same time, Nosworthy moved to the corner of a nearby truck facing the white van where Madden hid on the opposite side of Foster. Nosworthy Decl., App. 245. Madden refused to drop the weapon and continued to "scream[] incoherently about his daughter." Foster Aff., App. 77. Again, Foster commanded Madden to drop the gun, and Madden refused to comply. *Id.* Foster attempted to "talk [Madden] down," but Madden stated he "needed to protect his daughter" and that "he had taken cocaine." *Id.* Foster described Madden's statements as "incoherent." *Id.* Madden again placed his gun under his chin and "scream[ed] that he would kill himself." *Id.* Madden then told the officers he wanted the police to kill him. *Id.* While Foster attempted to speak with Madden again, he heard "what sounded like [Madden] racking" his gun. Madden then announced he "put a bullet in the chamber" and "would kill [the officers] if [they] did not kill him." *Id.* Madden began to roll around underneath the van with his gun in hand, positioning his body with his back towards

3

Foster. According to Nosworthy, Madden repeated his threat to kill the officers multiple times. Nosworthy Aff., App. 234.

Meanwhile, at approximately 7:55 p.m. that day, Gribbon and his partner officer Matthew Rushing received a "Priority 1 crisis intervention call" over the radio in their squad car. Gribbon Decl., App. 2. The radio transmission reported that a man with no shirt was pointing a handgun at himself in the parking lot of a car dealership. Gribbon's Body-Worn Camera, App. 1 at 00:50-01:20. When Gribbon arrived, there were at least four police cars and eight officers. *See id.* Gribbon exited the vehicle with his gun drawn, ran to the parking lot, and joined the other officers there.[2] *Id.* at 04:50-05:10.

Gribbon maintains in his declaration that he saw Madden underneath the van surrounded by other vehicles and officers who had their weapons out. Gribbon Decl., App. 3. Gribbon slowly approached the van with his weapon, at first remaining approximately twenty feet away. Gribbon's Body-Worn Camera, App. 1 at 04:05-05:10. Gribbon warned the officers near him to watch the crossfire and moved closer to Madden. *Id.* at 05:05. After telling officers to "get some cover," Gribbon approached Nosworthy, who remained bent down at the rear of a nearby van approximately ten to fifteen feet away from the van covering Madden.[3] *Id.* at 05:16-05:18. According to Foster, Foster tased Madden on his backside after he rolled on the ground with his gun and positioned his back towards Foster. Foster Aff., App. 77. Madden screamed in response, but Foster did not observe any other reaction. *Id.*; *see* Gribbon's Body-Worn Camera, App. 1 at 05:19. Approximately one second after, Gribbon pointed at Madden and exclaimed "what the f**k is he doing?" *Id.* at 05:20. Gribbon then squatted next to Nosworthy. *Id.*

---

[2] According to Gribbon, moments before arriving at the location, another officer relayed to him that Madden was inside a vehicle with a female. Gribbon was "concerned that this situation could turn into a barricaded person with a hostage." Gribbon Decl., App. 3.

[3] Due to the camera angle, Madden remains out of view throughout the duration of the video.

A few seconds later, Gribbon claims he watched Madden, still facing Defendants, reach for the pistol under his body, fumble it in his hands, then gain full control of it. Gribbon Decl., App. 3. Gribbon shouted at Madden, "Drop it. Drop it. Drop it. Drop it. Drop the Gun." Gribbon's Body-Worn Camera at 05:26. Gribbon asserts that at the same time he shouted the demands, Madden started turning the gun in Gribbon and Nosworthy's direction. Gribbon Decl., App. 3. Nosworthy tased Madden. Nosworthy Decl., App. 245; *see* Gribbon Decl., App. 3. Almost simultaneously, "[r]ight as the barrel [of Madden's gun] was to the point where [Madden] could shoot and kill [Gribbon]," Gribbon fired a single shot. Gribbon Decl., App. 3; *see* Gribbon's Body-Worn Camera at 05:26-05:28; Nosworthy Decl., App. 245. Madden did not appear to react to the tasing, and the bullet from Gribbon's shot missed Madden, striking the van's front right wheel. *Id.*; *see* Autopsy Report, App. 156-62 (indicating no gunshot wound); Inv. Docs., App. 195. Gribbon and other officers continued shouting at Madden to drop the gun; Madden still refused. Gribbon's Body-Worn Camera at 05:31-06:03.

Nosworthy and Gribbon continued to watch Madden with their weapons drawn. *See id.* According to Foster, Madden "rolled onto his stomach" and "attempted to crawl away" with his gun still in his hands. Foster Aff., App. 77. Foster tased Madden for the second time. Gribbon's Body-Worn Camera at 06:03-06:05. Foster did not notice a reaction from Madden. Foster Aff., App. 77. Madden began to crawl out from under the van. *Id.* Foster grabbed Madden, pulled him off the floor, placed his arm behind his back, and recovered his weapon. *Id.* Other officers helped Foster handcuff Madden and take him to a nearby curb. *Id.*

According to internal DPD investigation documents, including affidavits from officers, the autopsy report, and investigation summaries, Madden still had foam around his mouth and was conscious when police removed him from underneath the van. Inv. Docs., App. 61, 72; Autopsy

5

Report, App. 161. Officers immediately took him to a grassy area, "placed him on the ground," and put him "in an upright position." Inv. Docs., App. 239. Madden "appeared responsive" and spoke to the officers. *Id.* One officer reported that he checked Madden for injuries and noticed cuts and scrapes on Madden's torso and legs and taser prongs in his upper torso. *Id.* at 82. Another officer noted that he saw two taser prongs in Madden's torso. *Id.* at 70, 82. Several minutes later, Madden appeared to be "having an adverse reaction to drugs," *id.* at 61, and became "unresponsive," Autopsy Report, App. 161. When paramedics arrived, Madden remained "minimally verbal" but "maintained a stable heart rate and blood pressure." *Id.* The paramedics removed the taser prongs from Madden, Inv. Docs, App. 76, and transported him to the hospital by ambulance. *Id.* at 61, 72. On route, one officer noted Madden had his eyes open, although he did not appear to blink during the ride. *Id.* at 72.

According to the Autopsy Report, Madden, still conscious, arrived at the emergency room with a "right pneumothorax," "possible liver laceration," and "right flank hematoma." Autopsy Report, App. 157. There, Madden suffered a seizure and was intubated. *Id.* at 161. His drug screen tested positive for cocaine, amphetamines, and cannabinoids. *Id.* First responders from Dallas-Fire Rescue reported their "primary impression" of his condition to be "Drug Use/Overdose – Cocaine." Prehospital Care Report Summary, App. 146. Over the course of the next two months, Madden's condition "deteriorated," as he suffered "[m]ultiorgan system failure," "fungemia," "necrotic extremities" and brain hemorrhages. Autopsy Report, App. 161-62.

Madden ultimately died on July 28, 2019. Cause of Death Report, App. 141. The sole cause of death indicated in his medical records was the "[t]oxic effects of cocaine and amphetamines."[4] *Id.* And the manner of death was listed as "accident." Cause of Death Report, App. 141; Autopsy

---

[4] In their Response Brief, Plaintiffs argue—without offering evidence—that the officers' tasing of Madden was a "direct causation" of Madden's death. Resp. Br. 4.

6

Report, App. 156-62. The autopsy explains that the drug effects, "superimposed on psychiatric disease likely exaggerated [Madden's] bizarre behavior" leading to the police confrontation where "he was tased . . . with several discharges . . . [and] became unresponsive after several minutes following taser discharge." Autopsy Report, App. 161. The origin of the pneumothorax was "unclear as there were no rib fractures identified by CT scan or autopsy." *Id.*

Plaintiffs filed suit against Defendants, other officers,[5] and the City of Dallas on May 21, 2021. *See* ECF No. 1. Defendants now move for summary judgment based on qualified immunity.

## II. LEGAL STANDARD

### A. *Summary Judgment*

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears the burden of showing that summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets his burden by informing the Court of the basis of his motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Id.*; FED. R. CIV. P. 56.

When reviewing the evidence on a motion for summary judgment, the Court must decide all reasonable doubt and inferences in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Walker v. Sears, Roebuck & Co.*, 853

---

[5] Plaintiffs filed suit against "Other John Doe Police Officers" but have not amended their Complaint to identify these parties. *See* Second Am. Compl. [ECF No. 26].

F.2d 355, 358 (5th Cir. 1988). The Court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

The nonmoving party, however, "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Davis v. Fort Bend Cty.*, 765 F.3d 480, 497 n.20 (5th Cir. 2014) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

## B. *Qualified Immunity*

Under 42 U.S.C. § 1983, private citizens may sue public officials for violations of their federal statutory or constitutional rights. *See Monroe v. Pape*, 365 U.S. 167, 171 (1961). Section 1983, however, shields public officials from civil liability under the doctrine of qualified immunity "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). This "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotation marks omitted).

The qualified immunity defense has two prongs: (1) whether an official's conduct violated a statutory or constitutional right of the plaintiff; and (2) whether the right was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson*, 555 U.S. 223. "A court may rest its analysis on either prong." *Dyer v. Houston*,

964 F.3d 374, 380 (5th Cir. 2020) (citing *Morgan v. Swanson*, 659 F.3d 359, 385 (5th Cir. 2011) (en banc)); *see Pearson*, 555 U.S. at 236.

An officer's invocation of qualified immunity "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *see Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). Once the movant asserts the affirmative defense of qualified immunity, the burden shifts to the plaintiff to "rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). However, "all inferences are [still] drawn in [the plaintiff's] favor." *Brown*, 623 F.3d at 253.

"To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (internal citations omitted). The Court should not accept the plaintiff's version of the facts when the video evidence "'blatantly contradict[s]' and 'utterly discredit[s]'" them. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020) (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (citation omitted)).

## III. ANALYSIS

### A. *Violation of Constitutional Right*

The Fourth Amendment confers the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. A seizure is unreasonable if it involves excessive force. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). To state a Fourth Amendment excessive force claim under 42 U.S.C. § 1983, a plaintiff must demonstrate "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly

9

unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). Because "inquiries regarding whether a use of force was 'clearly excessive' or 'clearly unreasonable . . . are often intertwined,'" courts often consider those questions together. *Hanks*, 853 F.3d at 744 (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)). An injury is "generally legally cognizable when it results from a degree of force that is constitutionally impermissible—that is, objectively unreasonable under the circumstances." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).

### 1) Reasonableness of Force

The Court must determine the reasonableness of the use of force "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020) (holding that the use of force must be proportionate "to the situation"); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Excessive force claims are necessarily fact-intensive."). The totality of the circumstances must justify the particular use of force. *See Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008).

The ultimate inquiry is whether the force used was reasonable "under the facts as a reasonable officer *would perceive them*." *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016) (emphasis in original). In analyzing Defendant's use of force, the Court considers "only the facts

10

that were knowable" to Defendant at the time. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam); *see Brown*, 623 F.3d at 253 ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight.").

### *i.  Gribbon's Use of Force*

Plaintiffs' only charge of excessive force against Gribbon is the firing of a single shot from his duty weapon. Resp. Br. 5-6. The bullet did not strike Madden. *See id.*

Gribbon's gunshot during the confrontation between the officers and Madden was objectively reasonable under the circumstances. Of the factors identified in *Graham*, "whether the suspect poses an immediate threat to the safety of the officer or others" is of utmost importance in this case. 490 U.S. at 396. For cases where deadly force is involved, the Fifth Circuit has narrowed the excessive force inquiry to "whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting." *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001)). Therefore, the Court "need not look at any other moment in time." *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011). Where a suspect poses a "significant and imminent threat of serious harm" to one or more officers, the use of deadly force in response to the threat is justified. *Rockwell*, 664 F.3d at 991-92; *see also Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) ("The use of deadly force is constitutional when the suspect poses a threat of serious physical harm to the officer or others.").

When considering the threat posed to an officer, the Fifth Circuit gives great weight to whether a suspect is armed and defiant. In *Knoulton*, the Fifth Circuit held that an officer's shooting of an "armed, emotionally unstable, and potentially suicidal" suspect in a car was reasonable. 542 F.3d at 131. The suspect there refused to obey orders to show his hands, the officers saw he held a gun, and the suspect briefly put his hands together in what "could reasonably be interpreted as a

11

threatening gesture." *Id.* Similarly, in *Garza v. Briones*, the Fifth Circuit held that officers who fired sixty-one shots at an armed suspect at a truck stop—shooting him eighteen times and killing him—was reasonable when the suspect refused to obey requests to drop his weapon and raised a gun in the direction of an officer. 943 F.3d 740, 748 (5th Cir. 2019). And in *Wilson v. City of Bastrop*, the Fifth Circuit held that the officers' shooting and killing of an armed, fleeing suspect was reasonable when the suspect previously ran toward an officer and refused multiple demands to drop his gun. 26 F.4th 709, 715-16 (5th Cir. 2022).

The Fifth Circuit has also upheld the use of deadly force when a suspect does not carry a firearm but refuses to obey instructions. *See Elizondo*, 671 F.3d at 510 (holding that officer acted reasonably when he shot a suicidal suspect four times when the suspect failed to comply with commands to drop his knife, moved closer to the officer, and "raised the knife in a threatening motion"); *Mace v. City of Palestine*, 333 F.3d 621, 624-25 (5th Cir. 2003) (holding that it was not unreasonable for officer to shoot intoxicated suspect who brandished a sword after he failed to respond to officers' directives to drop the weapon and raised the weapon at the officers from approximately eight to ten feet away); *Rockwell*, 664 F.3d at 991-92 (holding that it was objectively reasonable for officers to shoot a suspect who carried two knives and charged in the direction of "one or more" officers).

Here, Gribbon faced an "immediate threat" to his own safety and the safety of others. *Graham*, 490 U.S. at 396. He was confronted with an "armed, emotionally unstable, and potentially suicidal" suspect. *Knoulton*, 542 F.3d at 131. Despite being directed several times to drop his weapon, Madden defied the orders, continued to shout and threaten suicide, and moved around under the van with a weapon in possession. *See Wilson*, 26 F.4th 709 at 715-16 (permitting deadly force where armed suspect refused requests to drop his weapon while he fled from police).

Madden then pointed his gun directly at Gribbon from no more than fifteen feet away.[6] Clearly responding to much more than a "threatening gesture," Gribbon fired a single shot. *Knoulton*, 542 F.3d at 131; *see Garza*, 943 F.3d at 748 (permitting deadly force against suspect who pointed gun at officer); *see also Wilson*, 26 F.4th at 714 ("[W]e have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety.") (quoting *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 n.6 (5th Cir. 2016)).

The undisputed facts demonstrate that Gribbon resorted to deadly force only after Foster attempted to calm Madden down, Foster and Nosworthy tased Madden, and other officers repeatedly shouted at Madden to drop his weapon. *See Joseph*, 981 F.3d at 332-33 (describing that "measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance" are constitutionally permissible); *see also Knoulton*, 542 F.3d at 131 (holding deadly force to be permissible when perceived threat of harm is severe even when officer did not attempt to use non-deadly force first). Gribbon, operating under rapidly evolving circumstances, was "not require[d] . . . to wait until [Madden shot his gun] to confirm that a serious threat of harm exist[ed]." *Id.* at 130 (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)); *see also Wilson*, 26 F.4th at 715 (holding that even if suspect never aimed his gun at the officer, officers "could have reasonably thought [suspect] posed a serious threat to onlookers"). Gribbon responded with actions that corresponded to Madden's escalating verbal and physical resistance, acts he "reasonably perceived" to constitute a threat to his life and the lives of others. *Griggs*, 841 F.3d at 313.

---

[6] Plaintiffs' allegations that Gribbon "did not know what was on Madden" or what Madden "was doing under the van" is belied by the objective evidence. Resp. Br. 4. The body-worn camera footage submitted by both parties clearly demonstrates that Gribbon knew Madden was armed and suicidal. *See* Gribbon's Body-Worn Camera at 00:50-01:20 (officer transmitting information to Gribbon via radio before he arrived on the scene that Madden was pointing a handgun at himself); *id.* at 05:26 (Gribbon commanding Madden to drop his gun multiple times before Gribbon discharged his weapon); *see also* Gribbon Decl., App. 3. The video evidence, therefore, "'blatantly contradict[s]' and 'utterly discredit[s]'" Plaintiffs' version of the facts. *Renfroe*, 974 F.3d at 599 (citation omitted) (quoting *Hanks*, 853 F.3d at 744).

Given the totality of the circumstances, the Court finds that Gribbon, encountering an armed, noncompliant suspect, used objectively reasonable force when he discharged his firearm in Madden's direction.

### *ii.    Nosworthy's Use of Force*

In viewing Gribbon's body-worn camera footage and reconciling it with other evidence in the record, the Court discerns three distinct taser discharges: one at 05:19 by Foster; the second at 05:26 by Nosworthy, occurring on video less than a second before Gribbon shot his firearm; and the last at 06:03 by Foster. *See* Gribbon's Body-Worn Camera; *see also* Inv. Rept., App. 28. On the issue of Nosworthy's use of force, the Court turns to whether the second taser discharge was unreasonable.

The Court considers "[t]he timing, amount, and form of a suspect's resistance" when determining whether the force was reasonable. *Joseph*, 981 F.3d at 332-33 (internal citations and quotations omitted). A suspect's failure to obey commands "may indicate physical force is justified." *Id.* When selecting a constitutionally appropriate degree of force, the officer must use "measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance." *Id.* Active resistance likely justifies more force than passive resistance. *See id.*

The Fifth Circuit has upheld qualified immunity defenses where officers tased unarmed suspects who failed to comply with police demands. *See Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him."); *Poole*, 691 F.3d at 626 (holding the use of tasers was not unreasonable where a suspect resisted arrest and officers ceased the use of the taser after "arrestee was handcuffed and subdued"); *Cloud v. Stone*, 993 F.3d 379, 384-85 (5th Cir. 2021) (holding officer's use of taser multiple times on

14

suspect was reasonable when suspect's actions prevented officer from completing the arrest and explaining that the Fifth Circuit pays "particular attention to whether officers faced active resistance when they resorted to a taser").

In *Carroll v. Ellington*, the Fifth Circuit held that an "officer's application of a [t]aser to an unarmed, seated suspect who fail[ed] to comply with an order to get on the ground" constituted reasonable force. 800 F.3d 154, 174 (5th Cir. 2015). There, an officer tased the suspect five times in a short time period when the suspect continued to ignore police directions. *Id.* Similarly, in *Ramirez v. Escajeda*, the court granted an officer qualified immunity when he responded to a 9-1-1 call regarding a suicidal suspect, found the suspect in the process of hanging himself, the suspect refused the officer's commands to show his hands, the officer tased him in response, and the suspect died soon after. 44 F.4th 287, 289 (5th Cir. 2022). In determining whether the officer's conduct was reasonable, the Fifth Circuit emphasized that the suspect was out of custody, creating a tense and uncertain situation for the officer, and the officer feared the suspect had a weapon, increasing the threat of harm. *Id.* at 293-94; *see also Ramirez, v. Guadarrama*, 844 F. App'x 710, 717 (5th Cir. 2021).

Here, Madden posed a significant and immediate threat of harm to himself and others. First, Madden was not in custody, presenting a greater threat than if he was subdued. *See Escajeda*, 44 F.4th at 293-94 (highlighting that officer did not have suspect "subdued" or under his control when he tased him, creating a "tense, uncertain, and rapidly evolving situation") (internal quotation marks omitted). Madden openly brandished a gun and refused to obey multiple police requests to drop his weapon. *See Wilson*, 26 F.4th at 715-16. Madden threatened to use his firearm on himself and officers. *See Mullenix*, 577 U.S. at 7 (reversing the denial of qualified immunity where suspect "threatened to shoot police officers" and "was moments away from encountering" police). Finally,

15

Madden pointed the weapon in Nosworthy and Gribbon's direction. *See Garza*, 943 F.3d at 748. In light of this threat, Nosworthy deployed non-lethal force. He gave Madden the opportunity to comply with Foster's attempted negotiation, orders, and taser stun first before using his own taser. *Contra Newman v. Guedry*, 703 F.3d 7557, 762-763 (5th Cir. 2012) (holding police tasing unreasonable where officer "immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands").

As such, the Court finds that Nosworthy acted reasonably under the totality of the circumstances and did not violate Madden's constitutional right to be free from excessive force.

### 2) Causation of Injury

Defendants are also entitled to summary judgment because Plaintiffs fail to establish the causation element of a 42 U.S.C. § 1983 claim, which requires a plaintiff to prove that the injury resulted "directly and only from" the use of excessive force. *Cooper*, 844 F.3d at 522. For an injury to result "directly and only from" excessive force, the force must be a "contributory cause" of death or injury. *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 444 (5th Cir. 1998); *Goode v. Baggett*, 811 F. App'x 227, 231 (5th Cir. 2020); *see also Jones v. Hosemann*, 812 F. App'x 235, 238 (5th Cir. 2020) ("Only when those individual actions 'proximately cause[]' the plaintiff's injury can that plaintiff seek relief under § 1983.").

In the present case, Plaintiffs contend that Defendants' actions—"having two or more police officers discharge their tasers, if not simultaneously, very close in time together immediately after another police officer discharged his firearm"—"direct[ly] caus[ed]" or "played an integral part" in Madden's death. Resp. Br. 4, 6. Plaintiffs further claim Madden's "symptoms at the time of [hospital] admission," including "cardiac arrest, seizure[,] RT Pneumothorax, and other severe

16

medical complications" "were directly consistent with known effects of tasing and more specifically excessive tasing." Second Am. Compl. ¶ 13.

The Cause of Death Report and Autopsy Report, however, state unequivocally that the cause of Madden's death was the "[t]oxic effects of cocaine and amphetamines" and that the manner of death was an "accident." App. 141, 156; *see also id.* at 146 (Prehospital Care Report Summary noting the healthcare providers' primary impression as "Drug Use/Overdose— Cocaine"). Plaintiffs present no evidence otherwise. Plaintiffs have not proved that Madden's death or injuries resulted directly and only from Gribbon's missed gunshot or Nosworthy's tasing. While the autopsy report indicates the origin of Madden's pneumothorax is unclear, Plaintiffs do not submit any evidence to support their claim or negate the medical records regarding Madden's cause of death. Accordingly, their claims are relegated to "mere allegations." *Manis*, 585 F.3d at 843.

### B. *Clearly Established Right*

In addition, Defendants are entitled to summary judgment based on qualified immunity because Plaintiffs have not met their "heavy" and "demanding" burden of showing that Defendants' use of force violated a clearly established right. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019); *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

To constitute a violation of a clearly established right, case law must place the constitutional question "beyond debate." *Morrow*, 917 F.3d at 874 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (emphasis omitted). "[T]he Supreme Court has repeatedly

17

instructed that clearly established law is *not* to be defined at a high level of generality. This is particularly true in recent years." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) (emphasis in original) (citing *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018); *Mullenix*, 577 U.S. 7). "[O]utside of an obvious case, the law is only clearly established if a prior case exists where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Hanks*, 853 F.3d at 747 (internal quotation marks omitted) (quoting *White*, 137 S. Ct. at 552).

Plaintiffs do not cite any case law that supports the conclusion that Defendants violated a clearly established right. Indeed, they cannot do so. The Fifth Circuit has denied the existence of a clearly established right in cases where officers shot and killed suicidal or potentially violent suspects. *See, e.g.*, *Mace*, 333 F.3d at 624-25 (holding there was no excessive force when officers shot intoxicated suspect who brandished a sword and refused to obey orders to drop the weapon); *Knoulton*, 542 F.3d at 131 (holding there was no excessive force when officers shot suspect who was mentally unstable, armed, and moving his hands in a threatening manner); *Harris*, 745 F.3d at 770, 772-73 (finding no constitutional violation where officers breached open bedroom door and shot suicidal suspect after he raised a knife over his head and advanced toward them). Similarly, the Fifth Circuit has denied finding a clearly established right where an officer fired multiple taser strikes in a short timespan at a suspect who remained seated, unarmed, and did not threaten violence. *See Carroll*, 800 F.3d at 174 (holding that officer who fired taser five times at an "unarmed, seated suspect who fail[ed] to comply with an order to get on the ground" did not violate clearly established law). Thus, even when officers used more force than that utilized by Defendants, against suspects who posed less of threat than Madden, the Fifth Circuit has declined finding a violation of a clearly established right.

18

Plaintiffs have not identified any clearly established law that is particularized to the facts at issue. Thus, the Court finds that Defendants are entitled to qualified immunity. As the Fifth Circuit recently held, "[t]he specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force." *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1166 (5th Cir. 2021).

## IV.    CONCLUSION

Viewing the facts and deciding all reasonable doubt and inferences in the light most favorable to Plaintiffs, Defendants Jason Gribbon and Dudley Nosworthy's Motion for Summary Judgment Based on Qualified Immunity [ECF No. 38] is **GRANTED**.

**SO ORDERED.**

SIGNED September 12, 2022.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**